IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:99-CV-190-BO

FILED
OCT 29 1999
David W. Daniel, Clerk
US District Court, EDNC
By ___T___ Dep. Clerk

| | |
|---|---|
| SCOTT ANDERSON,<br>  Plaintiff, | )<br>) |
| vs. | ) MEMORANDUM<br>) OPPOSING PROTECTIVE ORDER<br>) AND IN SUPPORT OF MOTION TO |
| CISCO SYSTEMS, INC.,<br>  Defendant. | ) ENLARGE DISCOVERY PERIOD<br>) |

Defendant has moved for a Protective Order against the noticed depositions of John Morgridge and John Chambers, who, as its Chairman and President, are the two most senior executives employed by Defendant Cisco. Plaintiff seeks to take such depositions upon oral examination to be recorded by videotape and transcribed by a court reporter.

Defendant's Memorandum proceeds upon the theory that Plaintiff is not seeking testimony for a proper discovery purpose. Defendant accuses Plaintiff of seeking to harass Cisco's executives whom it claims know nothing pertinent to this case. Defendant has proffered as supporting material the affidavits of the proposed witnesses Morgridge and Chambers, and a copy of an e-mail to plaintiff's counsel from plaintiff sent prior to suit. Defendant suggests further that the plaintiff has delayed in seeking these depositions until too late in the game.

The Protective Order sought by Defendant should be denied. Defendant's suggestions to the Court about Plaintiff's motives are untrue. The essential defense in this case to Plaintiff's charges of disability discrimination and retaliation which has been advanced to date by Cisco is that of embarrassingly poor performance by Anderson, both in public speaking and in one on one and small group encounters, which allegedly struck various individuals in Cisco as so damaging to its image that they complained his behavior to RTP site management. Anderson's rebuttal to that claim includes gathering evidence from various sources to the contrary.

As is reflected in the attached declaration of Scott Anderson, both Chambers and Morgridge, who are the two most senior Cisco executives and who presumably have the most at stake of any individuals in the company with respect to conduct which was "embarrassing" to Cisco and/or damaged its public image, had direct one on one contact on a number of occasions



with Plaintiff, at which times they would have had ample opportunity to observe deficiencies, if any, which are alleged to be the basis for the Plaintiff's termination, including any "embarrassment" to Cisco by using extremely poor speaking and communications skills, or exhibited very inappropriate personal behavior, in front of important members of the governmental, educational, and business communities.

In addition, due to the amount of one on one time spent by each proposed witness with Anderson, which again was during the same time period when, Cisco now alleges, Anderson exhibited very poor interpersonal communications skills, and displayed inappropriate behaviors in small group or one on one meetings, these witnesses were also in a position to observe the impact and impression that Anderson and Cisco made on a particular occasion.

With particular regard to Chambers, there is evidence in the record already that he exhibited a very high level of interest in the personal speaking and presenting skills of Cisco managers. (See Exhibit A to Anderson Aff.). (See also Wellman Dep. p. 126, line 22 through p. 127, line 21 ). (Chambers, per Wellman, is one of those who directs people to correct and fix their speaking style). Anderson has pointed out in his affidavit that he and Chambers spent extensive one-on-one time together on various specific dates in the pertinent time period. On the one hand, if Chambers recalls after having had his memory refreshed about these occasions, that Anderson did perform poorly, then Plaintiff is entitled to know what that testimony will be in order to prepare for trial or to respond to it at summary judgment. On the other hand, if Chambers denies recalling anything exceptionally bad about Anderson, despite opportunity after opportunity to see him perform poorly in important situations, then that too is significant evidence that Anderson's behavior was in fact not substandard, which evidence Anderson is entitled to develop and pursue.

The same comments may also be made about Morgridge, who in fact shared a speaker platform with Anderson, and spent extensive one on one time with him on a number of occasions. (Compare, Wellman Dep., p. 164 line 10 to p. 165, line 25). (Morgridge and Chambers both would have had the opportunity to observe Anderson),

Contrary to the suggestions of excessive in Defendant's memorandum, Plaintiff's counsel first requested deposition dates for Morgridge and Chambers at the deposition of Mr. Selby Wellman, which was taken September 3, 1999 at the offices of Defendant's counsel Renee

Montgomery. This was approximately 45 days prior to the end of the discovery period. Counsel for plaintiff followed up by phone approximately one week later, and then again on or about September 15, 1999. On September 30, 1999, when the requested deposition dates were still not forthcoming, Plaintiff's counsel wrote the attached letter and sent it by fax asking for dates. Finally, beginning early in October, 1999, Plaintiff's counsel attempted to reach agreement on an extension of time for discovery, one purpose of which was to take the referenced depositions. Defendant's counsel agreed in principle but wanted to limit Plaintiff to discovery from the two deponents, precluding, for example the provision of expert information based on what those witnesses might say. It is submitted that evidence from the two highest managers in Cisco - pro, con or neutral, as to Plaintiff's behavior would be highly significant to a trier of fact.

With regard to the suggestion that Plaintiff has delayed excessively in serving written discovery, it should be noted that Plaintiff had compiled and shared with Defendant prior to his own deposition most if not all of the pertinent papers he possessed in this case, and defendant at such deposition, taken in mid June 1999, used those and many of its own documents as well to examine Plaintiff. Moreover, Defendant served no Interrogatories on Plaintiff at all until September 15, 1999, one day *after* Plaintiff served his Interrogatories on Defendant!

The case law cited by Defendant is inapposite, all having to do with situations where no legitimate discovery purpose was served by the effort to depose high level managers. Defendant's proffer to the Court of an e-mail from Plaintiff to his counsel was sent prior to the time Plaintiff was fired, not during the litigation, and reflects merely the belief by Anderson that Wellman was proceeding to terminate him with greater ease by not involving higher ups. In fact, Anderson did succeed in obtaining an opportunity to present his side of things to Cisco California HR managers in the early part of 1998, and indeed negotiated and obtained a tolling agreement with Cisco counsel for the purpose of having the time to schedule such a presentation. See letters, redacted to remove details of settlement offers and demands, attached as Exhibit B to Anderson's Affidavit. Finally, when such efforts were unavailing, suit was filed. Nothing in the e-mail proffered by the Defendant, therefore, suggests, directly or indirectly, a motive of wanting to contact or harass any senior executives of Cisco as a tool to extort an improper settlement.

Defendant's attempt to ascribe an improper motive to these proposed depositions is therefore entirely meritless.

Conclusion

For the forgoing reasons, Defendant's Motion for Protective Order should be denied and the Discovery Period enlarged as requested by Plaintiff.

This the 29th day of October, 1999.

*Richard W. Rutherford*
Richard W. Rutherford
8521 Six Forks Road, Suite 305
Raleigh, NC 27615
NC State Bar 12106
(919) 845-0845 Telephone
(919) 845-0720 FAX

CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Memorandum was deposited in the United States mail, postage prepaid, and sent by facsimile transmission, addressed as follows:

Renee Montgomery, Esq.
Parker, Poe, Adams & Bernstein
150 Fayetteville Street Mall
Suite 1400
Raleigh, NC 27602

This the 27 day of October, 1999.

*Richard W. Rutherford*
Richard W. Rutherford
Attorney for Plaintiff

C:\My Documents\MyFiles\Clients\Anderson, Scott\MemoopposingDepo.wpd

Page 162

1     A I don't know exactly, but I would assume that
2 it would, okay, if it was a formal complaint, sure. That's
3 something, normally, that our Human Resources Department
4 would do a full investigation of and write a report on, yes.
5     Q And would you be shown that report if you
6 were involved in it as a principal?
7     A Not necessarily. Well, I certainly wasn't.
8 I don't recall any such report, okay?
9     Q Would you be interviewed in connection with
10 that report if you were a principal?
11     A If it were a claim against me, of course, I
12 would think I would.
13     Q Or a claim that you had done something wrong.
14     A Right.
15     Q Do you understand Mr. Anderson to be claiming
16 that you have done something in this case?
17        MS. MONTGOMERY: Objection. At what time?
18        THE WITNESS: No. I don't know that his
19 claim is that, okay? I know that Mr. Anderson probably has
20 some pretty strong negative feeling towards me, but I don't
21 think that's part of his claim.
22     BY MR. RUTHERFORD:
23     Q You've never actually read the complaint in
24 this case.
25     A No, I haven't.

Page 163

1     Q Or the charge of discrimination Mr. Anderson
2 filed.
3     A No, I haven't.
4     Q So you really don't know what his claims are
5 in this case.
6     A Well, it's been summarized to me by our
7 attorneys and by Sue.
8     Q Well, don't tell me what they told you, but
9 you haven't studied any documents purporting to be his
10 claims or his charges.
11     A No, I haven't.
12     Q Isn't it the case that you-- that there has
13 been no investigative report done of Mr. Anderson's charges
14 of discrimination?
15     A I have no knowledge of that.
16     Q One way or another?
17     A One way or another. I do recall-- let me
18 think about that. There was a claim with the E.E.O.C., I
19 believe-- is that the name of it-- and it was in Raleigh.
20 Yes, I do recall. The inves-- Sue handled it. The office,
21 the E.E.O.C. office, turned the claim down, and I don't
22 remember exactly why. And I'm trying to recall, did they
23 contact me, and the answer is, I don't think so. I think
24 Sue and the HR Department answered all of the responses and
25 I believe the claim was turned down. That's my recollection

Page 164

1 of it.
2     Q Did you prepare or sign any affidavits or
3 statements for the E.E.O.C. in connection with this case?
4     A I don't recall if I did or not, Dick.
5     Q Have you prepared any or signed any
6 statements at all in connection with this case?
7     A I don't think so. But, you know, we're
8 talking over two years ago. It's possible, but I don't
9 believe I did or have.
10     Q Who is the Chairman of the Board of Cisco
11 right now?
12     A John Morgridge.
13     Q Who is the CEO?
14     A John Chambers.
15     Q Do you know whether or not either Mr.
16 Morgridge or Mr. Chambers had an opportunity to work with
17 Scott Anderson during his employment at Cisco?
18     A I think both of them have, because they have
19 visited the site, okay, on previous occasions. So, yes, he
20 would have had the opportunity to interchange with them,
21 maybe even be involved helping set up a meeting or
22 something. But, yes, I believe he would have had that
23 interchange with both of them.
24     Q Do you know whether or not Mr. Anderson would
25 have had the opportunity to make a presentation or be a co-

Page 165

1 presenter with either of Mr. Chambers or Mr. Morgridge?
2     A I seem to recall about the tent incident, or
3 the groundbreaking incident, that Morgridge was here on the
4 program with Scott. I could be wrong on that, but that's to
5 the best of my memory.
6     Q And the tent or groundbreaking incident was
7 related to you by whom?
8     A To me?
9     Q Yes, sir.
10     A That would have come out in the fact-finding
11 early discussions from Sue, Zena-- I believe Wayne Clark
12 told me about it. It was confirmed by a number of people
13 that Scott's presentation was just very poorly done, in
14 front of hundreds of people, as well as outside guests.
15     Q I believe you mentioned to me that Mr. Akers
16 may have mentioned that as one of the specific occasions
17 when--
18     A It could have been Greg, too.
19     Q You say he mentioned a groundbreaking
20 ceremony, in my notes.
21     A It's the same one that I was told of. It
22 occurred-- see, that occurred before I came back, so I
23 wasn't here. But that was what everybody told me, all
24 right, as to how bad it was and how embarrassed they were
25 for Cisco.

Page 166

1  Q Do you think Mr. Morgridge may have been
2 present for that?
3  A Somewhere along the line, I heard that. I
4 don't know. That's something he does commonly. He will go
5 to groundbreaking ceremonies and things like that, when
6 requested. But I'm not sure. But it's easy to find out. I
7 mean, we can go back and look at the records.
8  Q And how about Mr. Anderson's opportunity to
9 be a co-presenter or a speaker on an occasion when Mr.
10 Chambers would be present?
11  A I wouldn't have any recollection of that.
12  Q I thought you indicated that you knew where
13 Mr. Chambers was all the time because you were right next
14 door to him.
15  A Most all of the time. So I don't-- again, I
16 have no memory of him ever being at RTP that I wouldn't have
17 been aware of. Is it possible he snuck in once when I was
18 traveling in the Far East or something? Possible, okay?
19 But I'm sure he would have mentioned it to me.
20  Q You're sure he would have mentioned what to
21 you?
22  A That he had been at RTP.
23  Q When was the last time you received any
24 training in equal employment laws?
25  A When you say training, you're talking about

Page 167

1 formal training or briefings by the HR Department or what,
2 all of the above?
3  Q I'm talking about training, in whatever sense
4 you know of the word.
5  A Our HR, Senior VP of HR, is a peer of mine,
6 whose name if Barbara Beck, okay? I can recall at off-site
7 meetings, staff meetings, from time to time, where she will
8 stand up and review, okay, to keep us informed of any major
9 changes and makes comments about it. So I would consider
10 that a form of training.
11  Q When was the last time that happened?
12  A Certainly in the last couple of years, last
13 two years, somewhere along the way. We have staff meetings
14 every month. It's hard to recall all the items, when we
15 discuss each thing, each different thing.
16  Q And as you indicated, you don't take notes.
17  A I do not take notes, no. It's one of my
18 weaknesses.
19  Q How about more formal training, where you
20 would sit down, for example, for an afternoon and go through
21 some books with a presenter?
22  A Those would have been back in the IBM days.
23  Q When you were hired on at Cisco, was there no
24 sort of orientation, "here's our policies," "here's how we
25 do things here," for you?

Page 168

1  A No. I'm a senior executive with many years
2 of experience I-- that's part of the thing that you gather
3 along the way. You just have knowledge of those things.
4 There would be no need to go back through any of that.
5  Q When was the last time when you were at IBM,
6 that last year?
7  A I left in 1984.
8  Q So when would you have had your first formal
9 training about the Americans with Disabilities Act of 1990?
10  A Just in staff meetings, conversations, by HR.
11  Q That would have occurred after your IBM days.
12  A Sure, 1990.
13  Q It would not have been formal training.
14  A If you refer to formal training as in a
15 classroom with a textbook, no. But would our HR people
16 inform of the changes in the laws and things like that, yes.
17  Q Just give me a minute or two. I may be
18 through.
19     (WHEREUPON, A RECESS WAS TAKEN
20       FROM 4:15 P.M. TO 4:35 P.M.)
21  BY MR. RUTHERFORD:
22  Q What other litigation have you been involved
23 in either as a plaintiff or a defendant or witness, other
24 than this case?
25  A I've been a witness, back in Paradyne days,

Page 169

1 to some suits by salesmen who were dismissed, over
2 commission debates. I remember a couple of those. They
3 weren't-- You know, I ran all sales and marketing, so I
4 owned the commission plans, so they called me as a witness.
5 But it was one of my field offices that actually were into
6 the issue. They used me as a-- to come in and explain the
7 plan and all that kind of stuff, okay. That's about it.
8 I've never had any complaints filed against me or anything
9 regarding the E.E.O.C. or employment or termination,
10 nothing.
11  Q So if I had asked you if you had any prior
12 experience with discrimination claims involving actions of
13 yours, you would have said, "no."
14  A Absolutely, no.
15  Q Within your business unit at Cisco, do you
16 get a report of any kind on the numbers and types of
17 discrimination claims that are received by Cisco?
18  A No, I don't. I could find out if I wanted,
19 but-- they're over in the HR Department. I'm a senior exec,
20 so it would be easy to find out, but I've never had a need
21 to know.
22  Q You don't know whether Cisco receives a large
23 number or a small number or no discrimination complaints?
24  A I have no knowledge, whatsoever.
25  Q I don't have any further questions right now.

Page 126

1 that's a good experience for them. So it's worked out quite
2 well.
3     Q Did you discuss with Mr. Anderson that he was
4 being paid too much to take a lower level position?
5     A I don't recall having that conversation.
6     Q Well, I thought you indicated to me that
7 doing lower level meetings was inappropriate for someone of
8 his position, stature, salary at Cisco; is that right?
9     A Well, it certainly would have been, but that
10 wasn't the discussion. The discussion was centered around,
11 there's no justification to have somebody full-time in a
12 lower level job like that.
13     Q You don't need a full-time position doing
14 that; is that right?
15     A No, not at all.
16     Q What is the EBC?
17     A Executive Briefing Center.
18     Q Is that a Cisco facility?
19     A Yes, it is.
20     Q Do you speak there?
21     A Regularly.
22     Q And do you and other Cisco executives that
23 speak there get rated on your speaking performance? Do you
24 know?
25     A That's correct.

Page 127

1     Q And reports on those ratings are transmitted
2 to the highest levels of Cisco, aren't they?
3     A Correct.
4     Q If there is a deficiency noted in terms of a
5 lower set of ratings than is desired, isn't it the case that
6 the higher level executives at Cisco make direction to
7 people to correct their performance?
8     A We ask them to make improvements, yes. To
9 figure out where the deficiency is, if it's just pure
10 presentation skills, take some classes and things like that
11 that improve skills, your ratings.
12     These are always in front of customers, so
13 we're-- we always like to look our best in front of
14 customers.
15     Q Isn't Mr. Chambers one of the persons who
16 directs people to correct and fix their speaking style?
17     A Correct. He doesn't do it at the lower
18 levels. He does it with his direct reports, myself and
19 about 13 others. And then we do that-- we drive that down
20 through our own organizations, that same part of our
21 culture.
22     Q Did there come a time after Mr. Anderson's
23 termination from Cisco when you became aware that he was
24 seeking to be rehired in some other capacity of Cisco?
25     A Somewhere-- and, again, time frames escape

Page 128

1 me-- but somewhere back there, Sue informed me that he had
2 applied for a position, I think with the local sales office.
3 I'm not sure about that. I know that he had applied
4 somewhere.
5     Q How was it that she was informing you of this
6 fact?
7     A She just told me. I don't recall the
8 circumstances why the subject came up. She just informed me
9 of it.
10     Q Did she send you an e-mail?
11     A I don't remember that.
12     Q Did you make any kind of response to that
13 news?
14     A No, because she told me that he wasn't
15 qualified and it was just a, you know-- it was all after the
16 fact.
17     Q She advised you after the fact of his not
18 being considered for that position.
19     A Correct.
20     Q Was this a fact for which you were required
21 to take any action?
22     A No.
23     Q Had you requested information on Mr.
24 Anderson's job applications, if he should make them to
25 Cisco?

Page 129

1     A No.
2     Q Well, is it normally the case that you hear
3 about job applications from former employees?
4     A I would say that anybody that would apply for
5 a job, particularly a former employee, clearly the HR
6 Department would know about it and most likely, if anybody
7 ever seriously considered that employee, they would call the
8 previous employer before they would ever pursue it. But I
9 received no calls or anything, so I don't know how far it
10 went or-- I know very little about it, other than Sue just
11 mentioned one time.
12     Q Would you read back the question again,
13 please?
14     (WHEREUPON, THE QUESTION CALLED
15     FOR WAS READ BACK BY THE COURT
16     REPORTER.)
17 BY MR. RUTHERFORD:
18     Q Would you answer that question, sir?
19     A Is it normal that I hear--
20     Q About job applications from former employees.
21     MS. MONTGOMERY:  Objection.
22     THE WITNESS:  I guess I would expect-- I
23 don't know about the word normal. I guess I would expect to
24 hear about it, okay? It's just a normal practice. If you
25 and I are at Cisco and you're interviewing a former

MR. ANDERSON-6/14-15/99    PAGE 109

1  OBJECTIVES, AND COMMENTS FROM OTHER PEOPLE SO THAT --
2  SO THAT, INDEED, HE COULD COME UP TO SPEED AS HE'S
3  JUST RECENTLY COMING ON. HE'S GOT A LOT OF NEW
4  REPORTS. AND THAT THEY WOULD TAKE THE STEPS TO GET
5  HIM BRIEFED FOR MY RELATIONSHIP AND ROLE AND
6  RESPONSIBILITIES IN A WAY THAT EVIDENTLY OTHERS HAD
7  THAT REPORTED TO HIM IN ENGINEERING AND MARKETING,
8  WHATEVER.
9      AND HE ENCOURAGED ME TO BE CURIOUS, FIND OUT,
10 SEARCH YOURSELF, AND TO BE ALERT TO THOSE AROUND ME,
11 TO ASK THOSE AROUND ME THAT INTERACT WITH ME FOR SOME
12 FEEDBACK AS TO THE CLARITY, CONCISENESS OF MY
13 COMMUNICATION. AND WE, I BELIEVE, MADE ARRANGEMENTS
14 TO GET BACK TOGETHER. I KNOW WE HAD A COUPLE OF MORE
15 TALKS ANYWAY, THAT I'M NOT RECALLING ANY SPECIFICS ON
16 RIGHT NOW, THAT TOOK PLACE PRIOR TO SUE COMING BACK
17 SOME WEEKS LATER.
18     Q. AT THIS POINT, WERE YOU WORKING WITH MR. ZURL
19 ON ANY TYPE OF PERFORMANCE IMPROVEMENT PLAN?
20     A. NO.
21     Q. OKAY. BEFORE YOUR MEETING WITH MR. WELLMAN
22 ON JUNE THE 9TH, DID YOU BELIEVE THAT ANY OF YOUR
23 BEHAVIOR AT ANY PUBLIC PRESENTATIONS OR AT ANY
24 MEETINGS HAD BEEN INAPPROPRIATE?
25     A. NO.

MR. ANDERSON-6/14-15/99    PAGE 110

1      Q. SITTING HERE TODAY, DO YOU BELIEVE THAT ANY
2  OF YOUR BEHAVIOR AT PRESENTATIONS OR IN MEETINGS WITH
3  OTHER PEOPLE, EITHER INTERNALLY OR EXTERNALLY, HAD
4  BEEN INAPPROPRIATE?
5      A. NO.
6      Q. YOU SAID THAT MR. ZURL ENCOURAGED YOU TO SEEK
7  FEEDBACK?
8      A. YES.
9      Q. WHAT DO YOU MEAN?
10     A. WELL, I MET WITH PEOPLE CONSTANTLY, AND HE
11 ENCOURAGED ME TO ASK, YOU KNOW, AT THE CONCLUSIONS
12 OF MEETINGS DURING INTERCHANGES WITH PEOPLE THAT --
13 THAT HAD AN OPPORTUNITY TO SEE MY COMMUNICATION STYLE
14 FIRSTHAND, DID I ANSWER ALL YOUR QUESTIONS? IS THERE
15 ANYTHING I COULD DO FURTHER TO ENSURE THAT WE
16 UNDERSTAND EACH OTHER? AND PROBE FOR, YOU KNOW, ANY
17 SIGNS OF WHAT MR. WELLMAN HAD REFERRED TO.
18     Q. DID YOU DO THAT?
19     A. NOT WITH EVERYBODY BY ANY MEANS, BUT, YES,
20 WITH SEVERAL PEOPLE.
21     Q. OKAY. COULD YOU DESCRIBE THAT? WHAT DID
22 YOU---
23     A. WELL, THE FIRST MEETING THAT I RECALL AFTER
24 THIS MEETING WITH SELBY WAS WITH A REPORTER WHO HAD
25 COME OVER TO THE FACILITY. AND -- AND I DON'T REMEMBER

MR. ANDERSON-6/14-15/99    PAGE 111

1  WHAT THE SUBJECT OF OUR CONVERSATION WAS. WE WERE IN
2  THE HABIT OF GETTING TOGETHER FOR JUST DISCUSSIONS SO
3  THAT HE COULD UNDERSTAND THE DYNAMICS OF CISCO. AND
4  WE HAD WORKED TOGETHER ON SEVERAL CASE -- INSTANCES.
5  I HAD COMMUNICATED WITH HIM BY PHONE, BY E-MAIL. I
6  HAD CONDUCTED AS THE CONDUCTOR OF INTERVIEWS WHERE HE
7  WAS ASKING OTHER CISCO EXECUTIVES, WHO WERE SPEAKING
8  ON CISCO'S BEHALF, QUESTIONS THAT WOULD APPEAR IN
9  PRINT LATER. THE MONTH BEFORE, THERE WAS SUCH A
10 MEETING -- A MONTH OR SO BEFORE, I THINK IT WAS,
11 TWO -- A COUPLE OF MONTHS BEFORE -- WITH -- IN
12 GREENSBORO, NORTH CAROLINA, WHEN JOHN CHAMBERS, THE
13 PRESIDENT OF CISCO, CAME HERE AND AN INTERVIEW WAS
14 ARRANGED BETWEEN KYLE AND THE NEWS AND OBSERVER AND
15 THE PRESIDENT OF CISCO, AND I MADE THOSE ARRANGEMENTS,
16 AND HANDLED THAT.
17     SO, ON A -- THAT WAS A THING THAT KARL SAID BE
18 ALERT FOR -- BE ALERT FOR THOSE PEOPLE THAT KNOW YOU
19 IN SEVERAL DIFFERENT SITUATIONS AND LISTEN TO THEM
20 CAREFULLY ABOUT WHAT THEY HAVE TO SAY.
21     Q. WAS HE ASKING YOU TO ASK THEM FOR FEEDBACK
22 ABOUT HOW YOU HAD PRESENTED YOURSELF, OR HOW YOU HAD
23 COME ACROSS TO THEM, IS THAT WHAT HE WAS ASKING?
24     A. NO, IT WAS MORE FOR CLARITY OF INFORMATION
25 AND COMMUNICATION. TO ENSURE THAT WE HAD CONNECTED

MR. ANDERSON-6/14-15/99    PAGE 112

1  TO TALK ABOUT WHAT THEY WERE THERE TO TALK ABOUT. DID
2  I ANSWER YOUR QUESTIONS? IS THERE ANYTHING MORE I CAN
3  GET YOU, THAT KIND OF THING.
4      Q. SO, IT WAS REALLY MORE A TECHNIQUE TO
5  CONCLUDE A CONVERSATION TO BE SURE THAT YOU HAD
6  PROVIDED THE INFORMATION THAT THE PERSON NEEDED?
7      A. NO.
8      Q. NO. OKAY. I'M STILL CONFUSED ABOUT WHAT IT
9  WAS HE TOLD YOU TO DO, AND WHAT YOU DID.
10     MR. RUTHERFORD: OBJECTION, ASKED
11     AND ANSWERED.
12     A. PUT ANOTHER WAY, HE WAS LOOKING TO FULFILL
13 THE QUESTION THAT SELBY ASKED ME, CAN YOU NAME ONE
14 PERSON IN THIS COMMUNITY WHO KNOWS YOU THAT CAN SAY --
15 THAT CAN SUPPORT YOU. HE SAID, SCOTT, IDENTIFY THOSE
16 PEOPLE. KARL ASKED ME TO IDENTIFY THOSE PEOPLE. AND
17 IN THE COURSE OF MY INTERACTIONS WITH THEM EXPLORE
18 THAT WITH THEM SO THAT YOU MIGHT LEARN AND FIND OUT,
19 YOU KNOW, IF THERE IS A PERSON THAT SUPPORTS YOU.
20     BECAUSE MY REACTION TO SELBY'S INITIAL COMMENT
21 WAS, I DIDN'T KNOW IF YOU WANT -- I COULD NAME TWENTY
22 BUT I COULDN'T NAME JUST ONE AT THE TIME. I WAS SO
23 CONFOUNDED BY MR. WELLMAN'S ASSERTIONS ON THE 9TH.
24     AND CARL, ON THE 12TH, AS YOU SAY, OR
25 SUBSEQUENTLY SAID HERE'S SOMETHING YOU CAN DO TO

MR. ANDERSON-6/14-15/99 PAGE 329

1 THAT SHE WAS CONCERNED THAT IN YOUR PRESENTATION YOU
2 LEFT THE IMPRESSION THAT CISCO WOULD PROVIDE TRAINING
3 FOR INTERESTED AND POTENTIAL EMPLOYEES?
4     MR. RUTHERFORD: OBJECT TO THE FORM.
5   A. THAT IN -- THAT WAS THE -- THE IMPRESSION
6 THAT SUE SAID THAT SHE HAD OF -- OF -- BUT THAT WAS
7 NOT THE MESSAGE.
8   Q. SO, YOU DIDN'T DIS -- YOU DIDN'T AGREE WITH
9 HER THAT YOU HAD LEFT AN INCORRECT IMPRESSION ABOUT
10 CISCO'S ROLE?
11   A. NO. AS A PART OF THAT PRESENTATION, SHE
12 ASKED A QUESTION THAT HELPED CLARIFY THAT ISSUE.
13 EVIDENTLY IT WAS CONFUSING TO HER OR SHE WAS CONFUSED
14 BASED ON THE INPUT THAT SHE HAD RECEIVED, AND IT GAVE
15 THE GROUP THE OPPORTUNITY TO COME TO A FULL
16 UNDERSTANDING ON IT, I THINK.
17   Q. SO, WOULD YOU SAY THAT HER INPUT IN THAT
18 MEETING WAS HELPFUL TO CLARIFY THAT ISSUE?
19   A. REAL -- YEAH -- REAL TIME INPUT WAS THE
20 QUESTION THAT SHE ASKED FROM THE FLOOR---
21   Q. UH-HUH (YES).
22   A. ---PARTICIPATED DISCUSSION THAT LENT TO
23 FURTHER DISCUSSION ON AN IMPORTANT ISSUE; YEAH.
24 THE---
25   Q. WHEN YOU MET WITH MS. WELLMAN ON OCTOBER THE

MR. ANDERSON-6/14-15/99 PAGE 330

1 10TH. DO YOU RECALL TELLING HER THAT YOU FELT LIKE
2 SELBY JUST DIDN'T LIKE YOU AND DIDN'T LIKE YOUR
3 STYLES?
4     MR. RUTHERFORD: MS. BEDFORD.
5     WITNESS: SUE BEDFORD.
6     MS. MONTGOMERY: I'M SORRY.
7   MS. BEDFORD.
8   A. I EXPECT THAT I HAD RAISED THAT IN AT LEAST
9 ONE MEETING, AND I DON'T KNOW EXACTLY WHEN IT WAS.
10 YES.
11   Q. OKAY. AND WHY DID YOU THINK THAT SELBY
12 DIDN'T LIKE YOU? DOES THIS RELATE BACK TO THE PHOENIX
13 COMMUNICATIONS ISSUE?
14   A. DURING THE WHOLE PERIOD, SELBY NEVER
15 INDICATED -- GAVE ME ANY INDICATION THAT THERE WAS
16 ANY WARMTH AT ALL OR THAT HE LIKED ME AND THE KIND --
17 I MEAN, YOU KNOW, THAT -- THAT WAS MY IMPRESSION;
18 YES.
19     MS. MONTGOMERY: LET ME HAND YOU WHAT
20 WE'LL HAVE MARKED AS EXHIBIT 26.
21     (THEREUPON, THE DOCUMENT REFERRED
22     TO BELOW WAS MARKED AS DEFENDANT'S
23     EXHIBIT NO. 26 - SCOTT ANDERSON
24     DEPOSITION - FOR IDENTIFICATION.)
25     (THEREUPON, WITNESS REVIEWS DOCUMENT.)

MR. ANDERSON-6/14-15/99 PAGE 331

1   Q. (BY MS. MONTGOMERY) THIS WAS PRODUCED BY
2 YOU, MR. ANDERSON. APPEARS TO BE AN E-MAIL FROM YOU
3 TO MR. RUTHERFORD, ATTACHING A LETTER FROM YOU TO JOHN
4 ROBERG; IS THAT CORRECT?
5   A. NO.
6     WITNESS: MIGHT I HAVE A MINUTE
7     TO REVIEW WHAT THIS IS?
8     MS. MONTGOMERY: SURE.
9     WITNESS: OKAY.
10    (THEREUPON, WITNESS REVIEWS DOCUMENT.)
11    WITNESS: THANK YOU FOR THE TIME.
12    MS. MONTGOMERY: OKAY.
13  Q. (BY MS. MONTGOMERY) DOES THAT REFRESH YOUR
14 RECOLLECTION ON THESE TWO COMMUNICATIONS?
15   A. YES.
16   Q. OKAY. AND FOCUSING FIRST ON YOUR NOTE TO
17 MR. RUTHERFORD, IT SAYS, "THIS NOTE TO CISCO CHAIRMAN
18 OF THE BOARD, JOHN." IS THAT SPELLED RIGHT?
19   A. MORGRIDGE.
20   Q. "MORGRIDGE MIGHT BE NOTICED BY SELBY AND
21 SUE." AND YOU'RE REFERRING TO THE ATTACHED NOTE FROM
22 YOU TO JOHN ROBERG?
23   A. NO, TO JOHN MORGRIDGE.
24   Q. I'M SORRY, TO JOHN MOR -- MORGRIDGE? OKAY.
25 AND YOU SAY, "I'M MORE CONVINCED DAILY THAT SELBY IS

MR. ANDERSON-6/14-15/99 PAGE 332

1 MOVING UNILATERALLY ON THIS WHOLE BUSINESS." WHAT DID
2 YOU MEAN BY THAT?
3   A. I SAY THAT TO -- TO -- TO DICK. I DIDN'T SAY
4 THAT TO JOHN MORGRIDGE.
5   Q. RIGHT.
6   A. OH.
7   Q. OKAY. WHY WERE YOU SAYING THAT?
8   A. THAT THE DEADLINE WAS COMING UP FOR OCTOBER
9 6TH AND I WAS GIVING -- WAS BEING GIVEN INDICATIONS
10 FROM BOTH SIDES THAT -- OF -- OF THE ISSUE AS TO
11 WHETHER I WAS GOING TO BE ABLE TO REMAIN THERE OR
12 NOT, AND THIS WAS A POINT WHEN AFTER WHICH SUE HAD
13 INDICATED THAT I SHOULD NEGOTIATE FOR A PACKAGE. AND
14 SO DICK AND I WERE WORKING TO NEGOTIATE A PACKAGE WITH
15 CISCO IN ORDER TO MAKING A SETTLEMENT.
16   Q. AND YOU WANTED TO CALL ATTENTION TO YOUR --
17 TO THE UPPER MANAGEMENT OF CISCO ABOUT YOUR -- YOUR
18 SITUATION BY KEEPING YOUR DEMANDS HIGH?
19   A. THAT HAS NOTHING TO DO WITH THE MORGRIDGE
20 NOTE. IS THAT WHAT YOU'RE REFERRING TO?
21   Q. WELL, LET'S GO ON; IT SAYS, "I DON'T BELIEVE
22 THAT OTHER LEADERSHIP IN THE COMPANY IS AWARE." WHAT
23 OTHER LEADERSHIP WERE YOU REFERRING TO?
24   A. I BELIEVE THAT SELBY WAS ACTING ON HIS OWN
25 BEHALF TO KEEP THIS ISSUE WITH ME SECRET, AND HE WAS

1  PROHIBITING ME FROM TALKING ABOUT IT TO ANYBODY OTHER
2  THAN HE AND SUE; AND I -- I WAS CONVINCED THAT WE --
3  THAT WE HAD TO GET BEYOND HIM IF WE WERE GOING TO BE
4  ABLE TO -- TO SETTLE. I -- I -- I -- I'D -- I'D -- I
5  WAS UNSURE THAT I WOULD BE ABLE TO REMAIN AT CISCO AT
6  THIS POINT.
7      Q. AND WHY DO YOU THINK -- WHY DID YOU THINK
8  THAT SELBY WAS TRYING TO KEEP THIS SECRET?
9      A. BECAUSE OF IN -- BECAUSE MR. WELLMAN HAD
10 NOT CONDUCTED THIS IN -- IN AN ETHICAL WAY. HE HAD
11 NOT -- MR. WELLMAN HAD -- HAD -- HAD, I BELIEVED,
12 PROCEDURALLY GONE ABOUT THIS IN A WAY THAT SHIELDED
13 THE REST OF THE ORGANIZATION, THE CISCO COMPANY, FROM
14 THE NORMAL PROCEDURES THAT WOULD -- WOULD -- WOULD
15 CARE FOR AN EMPLOYEE THROUGH ITS HUMAN RESOURCES
16 DEPARTMENT, AND -- AND LOOK OUT FOR THE PROTECTIONS OF
17 THE EMPLOYEES THAT ARE GUARANTEED BY ITS POLICIES.
18     Q. WHAT DO YOU THINK MR. SEL -- I MEAN -- YOU --
19 WHY DO YOU THINK -- WHY DID YOU THINK MR. SELBY WAS
20 DOING THAT?
21     MR. RUTHERFORD: MR. WELLMAN?
22     MS. MONTGOMERY: I MEAN MR. WELLMAN;
23     I THINK I'M GETTING TIRED.
24     A. HIS -- SELBY -- MR. WELLMAN'S ACTIONS LED ME
25 TO BELIEVE THAT I -- THAT -- THAT HE DIDN'T WANT ME

1  THERE AND WOULD USE WHATEVER STEPS HE HAD AT HIS
2  CONTROL TO -- TO HAVE ME FIRED REGARDLESS OF MY
3  PERFORMANCE OR ANY -- ANY FACTOR, A.D.D., OBJECTIVES,
4  WHATEVER. IT DIDN'T MATTER ANY MORE.
5      Q. DID YOU THINK THAT THIS RELATED BACK TO HIS
6  RELATIONSHIP WITH PHOENIX COMMUNICATIONS?
7      A. NO.
8      Q. YOU DID NOT?
9      A. NOT AT THIS POINT. THIS WAS -- THIS WAS
10 BEYOND -- WELL -- WELL BEYOND THAT POINT.
11     Q. IT SAYS, "BY KEEPING OUR DEMANDS FIRM AND
12 HIGH, WE'LL BE FORCE -- HE'LL BE FORCED TO SELL HIS
13 CASE HIGHER INTO THE CISCO ORGANIZATION"---
14     A. RIGHT.
15     Q. ---"FORCING EXPOSURE UNWANTED BY HIM IN
16 CREATING OPPORTUNITY FOR US."
17     A. THAT'S CORRECT.
18     Q. WHAT KIND OF EXPOSURE DID YOU THINK WAS
19 UNWANTED BY HIM?
20     A. HIS SIGNING AUTHORITY STOPS AT A CERTAIN
21 POINT, AND HE WOULD -- IF -- IF -- IF SETTLEMENT WAS
22 MADE AT A -- AT A LEVEL THAT WAS HIGHER THAN HIS
23 ASSIGNING AUTHORITY, THIS ISSUE MIGHT GET AIRED
24 THROUGHOUT THOSE THAT MIGHT BE INTERESTED IN THE
25 COMPANY IN FINDING OUT WHAT HE WAS DOING.

1      Q. AND SO IF YOU KEPT YOUR DEMANDS HIGH ENOUGH,
2  IT WOULD CALL ATTENTION TO YOUR SITUATION. IS THAT
3  WHAT YOU WERE SAYING?
4      A. YES.
5      Q. AND WHY DID YOU THINK EXPOSURE WOULD BE
6  UNWANTED BY HIM?
7      MR. RUTHERFORD: OBJECTION, ASKED
8      AND ANSWERED.
9      A. HE HAD TAKEN ANY STEP, THAT I WAS EXPOSED TO,
10 WAS AIMED AT LIMITING THIS TALK OF THIS SITUATION
11 BEYOND HE AND SUE BEDFORD.
12     Q. DID THAT LIMIT YOU FROM TALKING TO OTHER
13 PEOPLE WITHIN THE CISCO ORGANIZATION?
14     A. YES.
15     Q. THAT WAS YOUR UNDERSTANDING?
16     A. DIDN'T I ANSWER THE QUESTION? I SAID, "YES."
17 YEAH.
18     Q. OKAY. IS THERE ANYTHING IN YOUR PERFORMANCE
19 IMPROVEMENT PLAN THAT SAID YOU COULD NOT TALK WITH
20 ANYBODY ELSE IN THE CISCO ORGANIZATION?
21     A. YES.
22     Q. WHERE IS THAT?
23     A. YES.
24     Q. ARE YOU REFERRING TO PARAGRAPH SIX THAT
25 TALKS ABOUT THE PERFORMANCE IMPROVEMENT PLAN AND YOUR

1  OBLIGATION NOT TO DISCUSS WITH ANYONE IN THE COMMUNITY
2  THAT YOU INTERACT WITH ON BEHALF OF CISCO?
3      A. WOULD YOU LIKE ME TO READ THE PART TWO---
4      Q. EXHIBIT 8?
5      A. EXCUSE ME, I PROBABLY HAVE A COPY. "THIS
6  PERFORMANCE IMPROVEMENT PLAN IS CONFIDENTIAL AND
7  SHOULD NOT BE DISCUSSED WITH ANYONE, OTHER THAN SUE OR
8  SELBY" IS A SENTENCE -- THE FIRST SENTENCE OF POINT
9  SIX ON PAGE TWO.
10     Q. SO, YOUR TEST -- TESTIMONY IS THAT YOU COULD
11 NOT DISCUSS THE PERFORMANCE IMPROVEMENT PLAN WITH
12 ANYBODY, OR THAT WAS YOUR UNDERSTANDING?
13     A. THAT WAS THE REFERENCE MADE HERE. AS I SAID
14 YESTERDAY AS WELL, IT WAS EXPANDED BEYOND THAT SEVERAL
15 TIMES ON -- IN DISCUSSIONS WITH HIM.
16     Q. OKAY. DID YOU NOT UNDERSTAND THAT YOU COULD
17 HAVE GONE ABOVE SELBY WELLMAN AS PART OF CISCO'S
18 OPEN-DOOR POLICY IF YOU HAD A PROBLEM YOU WANTED TO
19 DISCUSS?
20     A. WOULD YOU PLEASE RESTATE THAT QUESTION?
21     Q. DID YOU NOT UNDERSTAND THAT YOU COULD HAVE
22 GONE TO MR. WELLMAN'S SUPERVISOR AS PART OF CISCO'S
23 OPEN-DOOR POLICY IF YOU HAD A PROBLEM WITH HIM?
24     A. I WAS VERY CLEARLY DIRECTED BY HIM NOT TO
25 TALK TO ANYONE ELSE IN CISCO ABOUT ANY OF THIS MATTER